1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Gaylord N. Pierce, a married man, | ) | No. 07-1023-PHX-EHC |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Central United Life Insurance Company, a corporation, | ) | |
| Defendant. | ) | |

Before the Court is Defendant Central United Life Insurance Company's Motion for Summary Judgment (Dkt. 31) and Plaintiff Gaylord N. Pierce's Motion for Partial Summary Judgment on the Issue of Interpretation of the Contract (Dkt. 33). On March 9, 2009, the Court held an oral argument on the Parties' Motions. (Dkt. 56.) For the following reasons, the Court denies Defendant's Motion and grants Plaintiff's Motion.

**I.  Factual Background**

Plaintiff Gaylord Pierce ("Pierce") is a licensed insurance agent who sold cancer policies in Arizona. (Dkt. 32, ¶ 1.) Pierce worked as an agent for Dixie National Life Insurance Company ("Dixie"). (Dkt. 32, ¶ 2.) In 1991, while working as an agent for Dixie, Pierce purchased a Cancer Treatment Benefit Policy (the "Policy") from Dixie. (Dkt. 32, ¶ 2.) Pierce was the selling agent when he purchased the Policy. (Dkt. 32, ¶ 4.)

/ / /

On July 1, 1994, Central United Life Insurance Company ("Central United") assumed all of Dixie's contractual liabilities "under the same terms and conditions as set forth in this Policy." (Dkt. 34, ¶ 12.) In a letter dated December 21, 1994, Central United informed Dixie policyholders that it "assumed all rights, title and obligations of [their] health and/or disability income insurance policy with Dixie National." (Dkt. 34, Exh. 4.) Enclosed in the letter was a Certificate of Assumption and a sheet titled "Answers to Frequently Asked Questions," which stated, in part, "ALL PROVISIONS AND BENEFITS OF YOUR POLICY WILL REMAIN THE SAME." (Dkt. 34, Exh. 4 (emphasis in original).)

The Policy is a supplemental insurance policy, and it obligates the insurer to provide "identified benefits in the event an insured suffers a covered loss for the treatment of cancer. . . ." (Dkt. 32-3 at 2 - the Policy.) The Policy explains that the insurer "will pay benefits to which [the insured is] entitled immediately upon receipt of proof of loss supporting the claim." (Dkt. 42, ¶ 46.) Dixie's sales literature asserts that the policy would pay "**100% of the actual charges**" for radiation therapy and air transportation to obtain cancer treatment. (Dkt. 32, ¶ 5 (emphasis in original).) The Policy states, in relevant part:

> (F) . . . **Radiation Therapy** . . . We will pay the **actual charges** for teleradiotherapy . . . when used for the purpose of modification or destruction of tissue invaded by cancer . . .
> \*\*\*
> (J) **Transportation and Lodging Benefit** . . . We will pay the **actual charges** made by a common carrier for transporting the insured by aircraft . . . to the nearest hospital . . . providing special treatment for cancer.

(Dkt. 32, ¶ 6 (emphasis added).) Although the Policy contains a definition's section, the phrase "actual charges" is not defined. (Dkt. 42, ¶ 47.)

One of the sales brochures for the Policy states "[t]his policy covers the cost of cancer care and provides direct cash payment to its policyholder." (Dkt. 34, Exh. 5.) Under a section entitled "Why Have Cancer Insurance?", the brochure states that "for every $1000 of costs associated with cancer, $667 are non medical [sic]." (Id.) The phrase "actual charges" appears in the brochure numerous times, but is never defined. (Id.) The brochure indicates that the Policy "PAYS IN ADDITION to any other insurance, private or government, including Medicare, and directly to you or whomever you designate." (Id.

(emphasis in original).) It further indicates that the Policy "will not pay for any loss except for losses due directly from cancer." (Id.)

Before February 1, 2003, Central United paid "actual charges" benefits based on the amount indicated on the health care provider's bill. (Dkt. 42, ¶ 71.) In 2003, Central United decided to change the way benefits were being paid under the Policy by changing the claims processing procedure. (Dkt. 42, ¶ 70). In August 2003, Central United sent an "Important Notice Regarding Cancer Claims" letter ("Notice Letter") to all policyholders, stating, in relevant part:

> In today's health care system, there is often a significant difference between the amount a provider bills for a service versus the amount the provider, in fact, charges for that service . . .
> ***
> In those instances where the benefit amount under your supplemental cancer policy is based upon the amount you are charged or the actual charges for a particular benefit and is not a specified limited benefit, we determine the charge or fee based upon the amount that the provider has, in fact charged: that is, the amount the provider has accepted as full payment by you or on your behalf for the service rendered.

(Dkt. 32, ¶ 9.) After February 2003, Central United paid "actual charges" based on the amount paid by the insured and/or the insured's primary insurance provider in satisfaction of the health care provider's bill.

In October 2003, Pierce was diagnosed with cancer. (Dkt. 32, ¶ 11.) Pierce underwent treatment for his cancer, including radiation treatment, at Arizona Oncology Services ("AOS"), from December 31, 2003 through February 23, 2004. (Dkt. 32, ¶ 12.) During his treatment from AOS, Pierce had primary medical coverage through his employer with Aetna Insurance Company. (Dkt. 32, ¶ 13.)

Pierce submitted claims to Central United for the radiation treatment from AOS and transportation expenses. Central United's payments to Pierce were based on Central United's post-February 2003 payment practices. For example, Pierce submitted a $2,638.00 claim to Central United for radiation treatment received on January 12, 2004. (Dkt 32, Exh. 5.) According to the AOS Statement, dated September 9, 2005, the amount for the services, covered under the Policy, was $2,638.00. (Dkt 42, Exh. 5 at 2.) Pierce's primary insurance paid $691.06 and Pierce paid $76.79, totaling $767.85. (Id.) The remaining $1,970.15 was

written off as an insurance adjustment.[1]  (Id.)  Central United mailed Pierce a check for $767.85 for the January 12, 2004 treatment.  (Dkt. 32, Exh. 5.)

On May 19, 2004, Pierce wrote a letter to Parris Deason, supervisor of the Claim Department for Central United.  (Dkt. 32, Exh. 5(B).)  In the letter, Pierce contended that the change in how Central United paid "actual charges" did not apply to the Policy he purchased from Dixie in 1991.  (Id.)  Pierce received a response from Mary Lou Rainey ("Rainey"), corporate counsel for Central United, in a letter dated June 8, 2004.  (Dkt. 32, Exh. 5(C).)  The letter informed Pierce that the list prices on the providers' statements were "essentially fictitious."  (Id.)  The letter from Rainey stated "[w]e can no longer rely on the provider's statements to determine the amount of the actual charge of the covered service since those statements do not disclose the amount that they accepted as payment."  (Id.)  Rainey informed Pierce that Central United "paid you your full benefits pursuant to the terms of your insurance contract. We are unable to pay more than the amount that was actually charged for your treatment."  (Id.)

## II.  Procedural History

On November 17, 2003, a class action lawsuit, Welch v. Central United Life Ins. Co., et al., Civil Action No. 4:03CV422-P-B (N.D. Miss), was filed in Mississippi against Defendant, Central United, for failure to pay benefits based on actual billed charges, under the Dixie supplemental insurance policy.  (Dkt. 42, ¶ 77.)  Plaintiff, Pierce, was a member of the proposed class.  (Id.)  The class action was dismissed for lack of jurisdiction on February 2, 2005.  (Dkt. 42, ¶ 78.)  Plaintiff filed a lawsuit against Defendant in Mississippi

---

[1] An insurance adjustment is a contractually agreed upon reduction in the amount that the insured must pay in satisfaction of his/her liability to the health care provider.  Health care providers routinely accept reduced payments on behalf of patients, based upon contracts with insurers or government entities, in exchange for anticipated increased business and prompt payments.  See Banner Health v. Medical Sav. Ins. Co., 163 P.3d 1096, 1101-02 (Ariz. Ct. App. 2007) (discussing the difference between the amount accepted as payment and the amount billed to patients).

on November 27, 2006. (Dkt. 42, ¶ 79.) Plaintiff's Mississippi lawsuit was dismissed for lack of jurisdiction on July 10, 2007. (Dkt. 42, ¶ 83.)

On April 19, 2007, Plaintiff initiated this action in Maricopa County Superior Court, asserting three claims for relief: (1) breach of duty of good faith and fair dealing; (2) breach of contract; and (3) declaratory relief. (Dkt. 1-2 at 7.) On May 21, 2007, Defendant removed this action to this Court, alleging diversity jurisdiction. (Dkt. 1.) Defendant is a foreign corporation organized under the laws of Arkansas, with its principal place of business in Houston, Texas. (Dkt. 1 at 2.) Plaintiff is a resident of Arizona. (Id.) The alleged amount in controversy exceeds the jurisdictional prerequisite. (See Dkt. 10 (denying Plaintiff's Motion to Remand for not meeting the jurisdictional minimum).) This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff argues that Defendant failed to pay the full benefit owed to him under the Policy. (Dkt. 1-2, ¶ 12 - Complaint.) Plaintiff alleges that Defendant inappropriately paid "the actual amounts that the policyholders paid or their insurers paid on their behalf," rather than the "actual charges billed by health care providers." (Dkt. 1-2, ¶ 8.) The Parties' dispute centers on the interpretation of the phrase "actual charges" in the Policy.

On March 31, 2008, Defendant filed a Motion for Summary Judgment on Plaintiff's breach of contract and bad faith claims. (Dkt. 31.) On that same day, Plaintiff filed a Motion for Partial Summary Judgment on the issue of interpretation of the contract. (Dkt. 33.)

### III. Summary Judgment Standard

A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate

///

the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing version of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). In assessing whether a party has met its burden, the Court views the evidence in the light most favorable to the nonmoving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). When reviewing cross-motions for summary judgment, the Court should consider all evidence properly submitted by the parties in support of and in opposition to both motions for summary judgment. Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1135 (9th Cir. 2001).

**IV.    Discussion**

Defendant moves for summary judgment, alleging that it paid Plaintiff "100% of the amount [Plaintiff's] providers accepted as payment in full from Plaintiff's major medical carrier as supplemented by Plaintiff's own payment of his co-payment and deductible." (Dkt. 31 at 1-2.) Defendant argues that (1) the meaning of "actual charges" in the Policy is clear and unambiguous, (2) paying medical and non-medical "actual charges" consistently is not a breach of the Policy, (3) Plaintiff's interpretation of "actual charges" is inconsistent with the fundamental purpose of insurance to indemnify against actual loss, (4) the bad faith claim is barred by the statute of limitations, and (5) the bad faith claim fails as a matter of law. (Dkt. 31 at 7, 11-14.) Defendant further contends that "the purpose of the transaction, the language of the clause, and the public policy concerns demonstrate that 'actual charges' only refers to real amounts that Pierce was legally obligated to pay." (Dkt. 32 at 8.)

/ / /

/ / /

Plaintiff moves for partial summary judgment, arguing that the Court should find that "'actual charges' under this insurance policy means the amount charged by health care providers, without any reduction based on what other insurers might pay, or what amount the health care provider might accept as payment in full because of a contract with another insurer." (Dkt. 33 at 1.) Plaintiff contends that the phrase "actual charges" is at the very least ambiguous and disputes whether Defendant paid the full amount owed to Plaintiff, according to Defendant's interpretation of "actual charges." (Dkt. 41 at 2, 7.) Plaintiff also disputes that the statute of limitations has run on the bad faith claim and argues that there are issues of fact that precludes summary judgment on the claim. (Id. at 7, 12.)

### A. Breach of Contract Claim

The primary issue before the Court is how to interpret the phrase "actual charges" as used in Plaintiff's supplemental insurance policy. As a federal court sitting in diversity, this Court is bound to apply Arizona substantive law to Plaintiff's state law claims. See McClaran v. Plastic Indus., 97 F. 3d 347, 356 (9th Cir. 1996) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)). An insurance policy is a contract between the insurer and the insured. Tolifson v. Globe Am. Cas. Co., 672 P.2d 983, 984 (Ariz. Ct. App. 1983). "[T]he interpretation of a contract is a question of law for the court and where the language of a contract is clear and unambiguous it must be given effect as it is written. Whether a contract is ambiguous or not is also a question of law." Amfac Distrib. Corp. v. J.B. Contractors, Inc., 703 P.2d 566, 570 (Ariz. Ct. App. 1985).

"Contracts are to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity." Harris v. Harris, 991 P.2d 262, 265 (Ariz. Ct. App. 1999). A policy is ambiguous if it "presents conflicting reasonable interpretations." State Farm Mut. Auto Ins. Co. v. Wilson, 782 P.2d 727, 733 (Ariz. 1989). "Interpreting an insurance contract, we look first to the policy language." Lennar Corp. v. Auto-Owners Ins. Co., 151 P.3d 538, 546 (Ariz. App. 2007) (citing Associated Aviation Underwriters v. Wood, 98 P.3d 572, 593 (Ariz. App. 2004)). After looking at the language of a policy, "[i]f a clause appears

ambiguous, we interpret it by looking to legislative goals, social policy, and the transaction as a whole." First Am. Title Ins. Co. v. Action Acquisitions, LLC, 187 P.3d 1107, 1110 (Ariz. 2008) (citing Employers Mut. Cas. Co. v. DGG & CAR, Inc., 183 P.3d 513, 515 (Ariz. 2008)). "If an ambiguity remains after considering these factors, we construe it against the insurer." Id. (citing DGG & CAR, Inc., 183 P.3d at 515). The Court does not resort to resolving the ambiguity against the insurer "unless other interpretive guides fail to elucidate a clause's meaning." Id. Therefore, "[t]he 'ambiguity' rule applies only after the court is unable to determine how the language of the policy applies to the specific facts of the case." DGG & CAR, Inc., 183 P.3d at 515. The Court must first determine whether the phrase "actual charges" can be resolved by looking at the language of the Policy.

### 1. Language of the Policy

When interpreting a phrase in an insurance policy according to its plain meaning, the Court should view the language from the perspective of "one not trained in law or the insurance business." Sparks v. Republic Nat'l Life Ins. Co., 647 P.2d 1127, 1134 (Ariz. 1982) (quoting Fed. Ins. Co. v. P.A.T. Homes, Inc., 547 P.2d 1050, 1053 (Ariz. 1976)). Plaintiff interprets "actual charges" to mean the actual amount printed on the health care provider's bill (i.e., the amount billed). Defendant interprets "actual charges" to mean the reduced amount that the health care provider accepted as payment in full from the primary insurance provider and the insured (i.e., the amount paid). The difference between the amount billed and the amount paid is the insurance adjustment. Thus, the Parties dispute whether the insurance adjustment is included in the "actual charges" to Plaintiff.

Defendant argues that the meaning of "actual charges" is plain and unambiguous. Defendant asserts that the dictionary definition of "actual" and "charges" supports its arguments that this phrase refers to the insured's actual loss. (Dkt. 31 at 8-9.) Plaintiff argues that "actual charges" is not defined in the Policy and is ambiguous. Plaintiff asserts that, until 2003, Dixie and Central United interpreted the phrase "actual charges" to mean the amount billed rather than the amount paid. (Dkt. 33 at 3.)

/ / /

The unique payment practices of the health care industry complicate the meaning of "actual charges." Ordinarily, the amount billed is also the amount that is or should be paid. As mentioned above, however, health care providers routinely accept an amount less than the amount billed as payment in full. This reduced amount is based upon contracts between health care providers and insurers, in which health care providers accept reduced payments on behalf of patients in exchange for anticipated increased business and prompt payments. See Banner Health, 163 P.3d at 1101-02 (discussing hospital payment practices).

The meaning of "actual charges" can reasonably be interpreted in multiple ways. See, e.g., Connor v. Am. Public Life Ins. Co., 448 F.Supp.2d 762 (N.D. Miss. 2006) (discussing reasonable interpretations of "actual charges" in an insurance policy); see also Metzger v. Am. Fidelity Assur. Co., 2006 WL 2792435, *4 (W.D. Okla. 2006) (finding that the undefined phrase "actual charges" in a limited benefit health insurance policy can reasonably be interpreted two ways). "Actual charges" can reasonably refer to the amount the provider literally charged or billed the insurer. For example, several health care dictionaries define "actual charge" as the amount billed. Ward v. Dixie Life Ins. Co., 257 Appx. 620, 625-26 (4th Cir. 2007) (citing MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 26 (4th ed. 1994); and MCGRAW-HILL ESSENTIAL DICTIONARY OF HEALTH CARE 133 (1998)). Conversely, "actual charges" could reasonably refer to the amount the provider ultimately accepted as payment in full, based upon the custom and practice of accepting less than the amount billed. See Ward, 257 Fed. Appx. at 625 (noting that "actual charges" could be defined as the amount the patient is legally obligated to pay for services). For a person not trained in law or insurance, it is also possible for the phrase "actual charges" to have a meaning outside those argued by the Parties, including, but not limited to, the amount that the insured paid out of pocket.

In this case, the phrase "actual charges" appears to be "susceptible to different interpretations." See Odom v. Farmers Ins. Co. of Arizona, 169 P.3d 120, 123 (Ariz. Ct. App. 2007). "Actual charges" could reasonably refer to the amount the medical service provider actually billed the insured or the amount the medical service provider actually

accepted as payment. The phrase "actual charges" is not defined in the Policy, although it is used several times to designate the amount of benefits. In addition, Central United has paid benefits under the Policy using both Parties' interpretations. Central United admits that, prior to February 2003, it paid "actual charges" according to the amount billed, although Central United now argues that the phrase "actual charges" is clear and unambiguous, as the amount the service provider accepted as payment. See Guidry v. Am. Public Life Ins. Co., 512 F.3d 177, 184 (5th Cir. 2007) (finding the insurer's arguments suspect because it changed the way it interpreted "actual charges" and then alleged the phrase was not ambiguous). "Thus, the language can reasonably be construed in more than one sense and the construction cannot be determined within the four corners of the instrument." See Bjornstad v. Senior Am. Life Ins. Co., 599 F.Supp.2d 1165, 1171 (D. Ariz. 2009) (quoting J.D. Land Co. v. Killian, 762 P.2d 124, 126 (Ariz. Ct. App. 1988)). To try and further resolve the meaning of the phrase "actual charges" the Court will consider the following factors: purpose of the transaction as a whole, social policy considerations, and legislative goals. See First Am. Title Ins. Co., 187 P.3d at 1110.

### 2. Purpose of the Transaction as a Whole

The purpose of the transaction as a whole does not resolve the ambiguity. Defendant argues that the purpose of insurance is to "reimburse and indemnify the insured against loss[,] not provide windfall recoveries." (Dkt. 38 at 8.) Defendant contends that the Policy only "provides benefits 'for a loss due to cancer.'" (Id.) Defendant also contends that Plaintiff has not suffered a loss beyond the amount that was paid in satisfaction of the bill because he was not required to pay the full amount billed. (Id.) Plaintiff argues that "the purpose of the insurance policy is to provide funds for non-medical expenses associated with cancer, which . . . far exceed the medical costs." (Dkt. 47 at 2.)

The Policy is clearly identified as a "limited policy" (Dkt. 32-3 at 1) that was advertised as paying in addition to other insurance that the insured might carry (Dkt. 34, Exh. 5). Although the purpose of primary health insurance coverage is to indemnify the insured against loss, the purpose of a supplemental insurance policy, like the one here, is to

supplement any primary health insurance and cover medical and non-medical expenses in addition to what the primary health insurance pays. In Arizona, "limited benefit coverage" is defined as "an insurance policy that is designed, advertised and marketed to supplement major medical insurance and that includes . . . fixed or hospital indemnity, [and] specified disease insurance. . . . " A.R.S. § 20-1137(b). Therefore, the purpose of the Policy is to supplement or pay in addition to any other insurance, not merely to indemnify against loss.

The purpose of the transaction as a whole encompasses both Plaintiff's and Defendant's views of the purpose. The Policy is intended to cover any loss by Plaintiff related to his cancer treatment, including both medical and non-medical expenses. The Policy language, which includes coverage of radiation therapy as well as travel expenses, supports this conclusion. Therefore, the purpose of the transaction as a whole does not clarify the apparent ambiguity of the phrase "actual charges."

### 3. Social Policy Considerations

Public policy considerations also do not sufficiently resolve the ambiguity of the phrase "actual charges." Defendant contends that interpreting the Policy in favor of Plaintiff would provide Plaintiff with a monetary windfall recovery that is several times what he paid to the health provider. Defendant argues that Plaintiff's interpretation would require insurers to pay "whatever fictional amount providers list in their statements." (Dkt. 38 at 10.) Although health care providers routinely accept reduced payments on behalf of many patients, that does not mean that the billed rates are "fictional." See Banner Health, 163 P.3d at 1101-02 (finding that the difference between the amounts charged to patients for medical services and the amounts accepted as payment for the same medical services are not unreasonable). The patient is responsible for the amount billed, whether insured or not.

A payment of benefits in excess of the medical expenses paid by Plaintiff and his primary insurance carrier does not cause an unreasonable result. See Guidry, 512 F.3d at 182, n. 6 (noting that for a supplemental insurance policy the payment of benefits in amounts exceeding actual expenses does not lead to an unreasonable result). There is "no windfall when insureds who paid for separate coverage collect just what they have paid for." Samsel

v. Allstate Ins. Co., 59 P.3d 281, 290 (Ariz. 2002). "Recovery of expenses from both medical payments coverage and other sources has long been both recognized and accepted in Arizona and elsewhere." Id. "If this were considered against public policy, then insurers would be forbidden to sell contracts guaranteeing payment of a fixed sum per day while one is hospitalized when it is known that the hospital expense will be paid by [an insurance provider] or [the government]." Id. (quoting 8A APPLEMAN ON INSURANCE LAW & PRACTICE § 4902.7 (1997)).

Moreover, Defendant fails to identify any facts showing that Plaintiff would recover any monetary windfall. If the Defendant wished to prevent a potential "windfall" on behalf of the insured, Defendant could have defined the phrase "actual charges" in the Policy, or at least remained consistent in its interpretation of the phrase. See Conner, 448 F.Supp.2d at 766 (noting that the insurer should have phrased its policy more clearly to indicate whether it would pay the amount initially and literally charged or the amount ultimately accepted by the provider).

Another relevant policy consideration is "the need for clarity in insurance contracts." Bjornstad, 599 F.Supp.2d at 1171. Insurance contracts are contracts of adhesion and generally leave the insured with no bargaining power. Id. "When the drafter of such a contract leaves an important term undefined, public policy deems that the consequences of the imprecise drafting should fall on the party that drafted the contract, was able to dictate the terms . . . and (almost always) has at its disposal a battery of personnel to serve its interests." Id. at 1172 (citing the Restatement (Second) of Contracts § 206 cmt. A (1981) (explaining the rationale behind construing an ambiguous term against the insurer)). However, neither of these policy considerations clarifies the meaning of the phrase "actual charges."

### 4. Legislative Goals

Looking to legislative goals does not resolve the ambiguity of the phrase "actual charges." There are no Arizona statutes relating to this issue, outside of A.R.S § 1137(b),

which defines a "limited benefit policy." There is also no reason to believe that the legislature has contemplated defining the phrase "actual charges" by statute.

### 5. Authority from Other Jurisdictions

The Court recognizes that a conflict of authority exists in cases from other jurisdictions regarding the interpretation of "actual charges" in similar insurance policies. District courts in Alabama and Louisiana have found that the phrase "actual charges" is unambiguous "when given its ordinary and plain meaning in the context of the policy" and that it means "the amount that the insured is legally obligated to pay." Claybrook v. Central United Ins. Co., 387 F.Supp.2d 1199, 1204 (M.D. Ala. 2005); Jarreau v. Central United Ins. Co., 2006 WL 2086011, *1 (M.D.La. 2006) (questioned by Guidry, 512 F.3d at 182, and Ward, 257 Fed.Appx. at 630). Conversely, the Fifth Circuit and Fourth Circuit have found the phrase "actual charges" as used in a supplemental cancer insurance policy to be ambiguous. Guidry, 512 F.3d at 182; Ward, 257 Fed.Appx. at 627. The Western District of Oklahoma has also found that the undefined phrase "actual charges" is ambiguous in a limited benefit health insurance policy. Metzger, 2006 WL 2792435 at *4-5. The Northern District of Mississippi has also held that "the term 'actual charges' as used but not defined in the subject policy means the amount of money the provider typed on the bills and sent to the insured and insurer." Connor, 448 F.Supp.2d at 766.

"Arizona follows the principle of construction that, where various jurisdictions reach different conclusions as to meaning, intent, and effect of the language of an insurance contract, a strong indication of ambiguity is established." Fire Ins. Exchange v. Berray, 694 P.2d 259, 262 (Ariz. App. Ct. 1983) (citations omitted); Cincinnati Ins. Co. v. Recreation Ctrs. of Sun City, Inc., No. 07-0329, 2008 WL 898725, *4 (D. Ariz. Mar. 31, 2008). Because various courts have disagreed on the interpretation of "actual charges" in similar insurance policies, it further suggests that the phrase is ambiguous. See Wilson, 782 P.2d at 732 (noting that a clause in an insurance policy may be ambiguous if two courts have reached diametrically opposite conclusions based on essentially identical wording).

///

**6.     Conclusion**

Having considered the language of the policy, the purpose of the transaction as a whole, social policy considerations, and legislative purpose, the Court finds that the phrase "actual charges" as used in the Dixie Insurance Policy is ambiguous. Because the Court finds that the phrase "actual charges" is ambiguous, the Court construes it in favor of Plaintiff, the insured. See First Am. Title Ins. Co., 187 P.3d at 1110. Therefore, the Court concludes that the phrase "actual charges" is reasonably defined as the amount billed by the health care provider, before any insurance adjustments that may reduce the amount that the health care provider accepts as payment in full. Because the Court construes the meaning of "actual charges" in Plaintiff's favor, the Court denies Defendant's Motion for Summary Judgment on the breach of contract claim and grants Plaintiff's Partial Motion for Summary Judgment on the breach of contract claim.[2]

**B.     Bad Faith Claim**

Initially, Defendant argues that the statute of limitations bars Plaintiff's bad faith claim. (Dkt. 31 at 13.) Defendant, however, concedes in its reply memorandum "that this Court should not grant summary judgment for [Defendant] based upon the running of the statute of limitations." (Dkt. 45 at 10.)

Defendant also argues that Plaintiff's bad faith claim fails as a matter of law. (Dkt. 31 at 14.) The "tort of bad faith is an intentional one," and it "arises when the insurance company intentionally denies, fails to process[,] or pay a claim without a reasonable basis for such action." Noble v. Nat'l Am. Life Ins. Co., 624 P.2d 866, 868 (Ariz. 1981) (quoting Anderson v. Cont'l Ins. Co., 271 N.W.2d 368, 376-77 (Wis. 1978)). "Implicit in the [insurance] contract and the relationship is the insurer's obligation to play fairly with its insured." Rawlings v. Apodaca, 726 P.2d 565, 570 (Ariz. 1986). "[A]n insurer may be held liable . . . when it seeks to gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment." Id. at 572. "If an insurer acts

---

[2]The Court does not have sufficient information to determine the amount of damages Plaintiff is entitled to on his breach of contract claim at this time.

- 14 -

unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" Zilisch v. State Farm Mut. Auto. Ins. Co., 995 P.2d 276, 280 (Ariz. 2000) (quoting Deese v. State Farm Mut. Auto. Ins. Co., 838 P.2d 1265, 1270 (Ariz. 1992)). According to the Arizona Supreme Court,

> while fair debatability [of the merits of a claim] is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition. The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.

Prieto v. Paul Revere Ins. Co., 354 F.3d 1005, 1010 (9th Cir. 2004) (quoting Zilisch, 995 P.2d at 280).

In this case, reasonable jurors could find that Defendant acted unreasonably and "knew or was conscious of the fact that its conduct was unreasonable." Id. For example, Defendant continued to pay under its pre-February 2003 meaning of "actual charges" to those policyholders who made claims under the Policy prior to that date. (Dkt. 41, Exh. 1 at 21-23.) Defendant contends that after February 2003 it did not change its interpretation, but rather began requesting information to properly determine what the "actual charges" were, while Plaintiff argues that Defendant's new interpretation of "actual charges" changed the benefits he would receive under the Policy. A jury could find that because Defendant processed "actual charges" differently under the same policy, it acted unreasonably. Defendant did not produce any evidence that would preclude a reasonable juror from finding that it was unreasonable in changing the way it processed "actual charges." Defendant also did not produce evidence to allow a juror to conclusively determine the rationale behind the processing change. Defendant's conduct raises a genuine issue of material fact as to whether it was unreasonable in handling Plaintiff's claim. Therefore, Defendant's Motion for Summary Judgment on the bad faith claim is denied.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 31) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. 33) is **granted**.

**IT IS FURTHER ORDERED** that the phrase "actual charges" as used in the Dixie National Life Insurance Company Cancer Treatment Benefit Policy shall mean, for the purpose of this action, the amount billed by the health care provider, without any reduction based on the amount that the health care provider accepted as payment in full.

**IT IS FURTHER ORDERED** that the Parties shall submit a Joint Status Report by **July 31, 2009**, updating the Court on the status of the case and proposing relevant case management deadlines and dates for trial.

DATED this 14th day of July, 2009.

_____
Earl H. Carroll
United States District Judge